All right, well we'll start. This is the case of Anthony Johnson versus the state. It's 123-0172. You have before you Justice Aurelia Puchinsky, Justice Terry Lavin, and myself, Justice James Fitzgerald Smith. The appellant will go first, and you're given about 15 minutes. We usually don't interrupt unless you get way off course, and then we ask questions at the end of your presentation. Then we let the appellee make their presentation the same time frame, and then we go for the conclusion. So with that, you may proceed. Great. Thank you very much, Your Honors, and may it please the Court. The Circuit Court here erred in denying Antwon Johnson post-conviction relief in light of powerful exculpatory evidence that was presented at the evidentiary hearing below. As an initial matter, the case against Antwon was always closely balanced. The evidence against him consisted of a statement that he always maintained was false and coerced, one that was not reduced to writing, one that the felony review state's attorney who took it called preposterous, a statement he made when he was 16 years old with an eighth-grade education, no parent or lawyer present. And there was also eyewitness identification testimony from two members of an opposing gang faction, identifications that were always shaky at best. The defense actually called a detective to impeach one aspect of one of those witnesses' testimony. And this court noted in the prior appeal that Antwon argued at trial that the state's two eyewitnesses misidentified him and were not credible. We now have evidence from the evidentiary hearing that corroborates Antwon's trial and would likely lead to a different result. Douglas Williams testified at the evidentiary hearing. He testified that he goes by the nickname Smurf. He testified that he was there when the shootings happened, that he got a good look at the shooters, and that Antwon was not among them. He testified that he was hanging out that night with his friends. These are fellow members of the Murder Town gang faction. He saw these three members of a rival gang faction approaching. He called out to warn his friends, which I think is an important detail, because Mahati Riley testified at trial that he heard someone call out a very similar warning right before the shooting. So there's corroboration there. Williams explained that the lighting conditions at the time were very bright. It was a busy street corner with shops nearby. He testified he got a very good look, that's his quote, at the offenders. He recognized Quick as one of them. He knew Quick to be one of the main shooters for the rival gang faction. He actually knew that quite well because Quick had just shot his sister two months earlier and one of his best friends. And he recognized the two people who were with Quick as members of the rival gang faction. He didn't know their names, but they were not Antwon. And he testified that he knew Antwon Johnson and knew what he looked like. He testified that he remembered his nickname as Big Mac. He described him as being this quote, short little dude who had braids. He knew who Antwon was. He knew what he looked like. And he explained that he would have recognized Antwon had he been there, but he was not there. There was also other evidence presented at the evidentiary hearing. I don't plan to spend much time on that at all, but the circuit court had other exculpatory evidence before it as well. It had affidavits from these affiants who the record or the testimony presented shows are now deceased. Terence Hilliard, his affidavit indicates that he was a member of the same gang faction as Williams. His affidavit mirrors what Williams testified to that he saw the shooters and Antwon was not one of them. There were also affidavits from Michael Johnson and Jason Nichols who were likewise members of this opposing gang faction. And also Antwon testified on his own at the evidentiary hearing, and he testified that he had absolutely nothing to do with this shooting. Now the circuit court erred in denying Antwon's actual innocence claim on the basis of this evidence. There's no dispute here that the Williams testimony was new. It's material. It's non-cumulative. I'm not going to go into that. This is all about the final prong of the actual innocence analysis, whether confidence in the verdict is undermined and a different result is reasonably likely. And the circuit court erred fundamentally in how it undertook that analysis. And it got the facts wrong along the way in very important ways. The evidence against Antwon, I mentioned, included the testimony of these two rival gang members who testified against him. And at trial, this court noted in the prior appeal, the lengths that defense counsel went to to undermine their credibility, exposed lies they had told the police, exposed their prior convictions, exposed their motivation to lie because they're a member of this rival gang. And they even called that detective to impeach a portion of their testimony. But the circuit court here found that Williams' new testimony at the evidentiary hearing didn't outweigh that evidence from trial because it didn't find that Williams was sufficiently credible. But that credibility finding was based on a plain misreading of the testimony. Specifically, the circuit court concluded that it couldn't accept this notion that the two victims who testified, Mahati Riley and Leroy Wright, concocted some sort of scheme to frame Antwon in the moments right after the shooting while the ambulances are arriving. It didn't buy that. And on that basis, it said that it could not believe Williams. But Williams didn't testify about that at all. There's nothing in his testimony about a scheme to frame Antwon or when such a scheme was hatched. The circuit court there appears to be thinking about the affidavits, which do indicate that at some point in time, not in the chaos right after the scene, but that there was this plot hatched. But Williams didn't say that. And whether or not the circuit court believes that or not is irrelevant to whether or not it believes Williams. It based this credibility finding on a mistake of fact, plain and simple. When we set aside that mistake of fact, what we're left with is the circuit court's description of Williams' demeanor in the courtroom and these other ways of assessing his credibility. And the court did not find that he presented himself in a non-credible way. On the contrary, and this is recorded in the record, Judge Lynn said, there may still be tension on the street. And on the street, I mean, from that neighborhood where this happened, from old street gang rivalries that are festering still in jail, I felt that and I saw that. In addition, Williams testified that Mahadi Riley, one of the people who was shot, was his best friend. And L'Oreal Wright was also a close friend. So Williams testified in spite of this palpable tension that the circuit court felt because of these old gang rivalries. And in spite of all of the reasons he had not to want to testify on Antoine's behalf, his testimony should have been credited. And the only reason the circuit court did not credit it is because it made this mistake of fact about what his testimony was. So as to actual innocence, the evidence presented is sufficiently conclusive. It does undermine confidence in the verdict and put the evidence presented at trial in a different light. I'd like to note that I think the circuit court may have applied the wrong standard here. It framed the inquiry and its quote was, would Mr. Williams' participation at the trial, had he been known, have changed it? That seems to be very close to the total vindication standard that the Supreme Court struck down in Robinson. Would it have changed the outcome is a very different question from is there a reasonable probability of a different outcome? And there is. And that's why we're asking this court to reverse. And that's without taking into account any of the other post-conviction evidence aside from Williams' testimony that I mentioned. The circuit court did not discuss the affidavits in its ruling at all. It didn't credit them. It didn't discredit them. It just didn't consider them. So to the extent there's any question about whether Williams' testimony alone creates a reasonable probability of a different outcome, this other evidence pushed this claim over the threshold and warrant a new So this court should reverse on the actual innocence basis and order a new trial with respect to that claim. Antoine's other claim is a Sixth Amendment ineffective assistance of counsel claim. Strickland, of course, as the court knows, has two prongs, whether the representation fell below an objective standard of reasonableness and whether there was prejudice as a result. As to the objective standard of reasonableness, I think this all boils down to one simple question. Does effective counsel have an obligation to canvas for witnesses at the scene when they're on notice that relevant witnesses are likely to be found there? And this court should answer that question in the affirmative. We all know, and I don't think there's any dispute, that effective counsel is required to undertake a reasonable investigation. That includes talking to witnesses. It is not confined, as the state would have it, the state presents in its brief, to only interviewing those witnesses that are in the police reports or that the state has identified. Effective counsel has an obligation to undertake an independent investigation. And counsel started that process here. She spoke to her client. The evidence shows that Antoine told his counsel that the rival members of the gang always hang out at that corner, that it's likely they are still there, and she should send someone there to talk to them. And counsel didn't do it. And that's not effective representation under these circumstances. As to prejudice, again, the circuit court's finding that there was no prejudice here relied upon that same misapprehension of fact, that we can't believe Douglas Williams because it's implausible that the scheme was hatched at the scene. But again, Douglas Williams never said that. The court is discrediting him on the basis of testimony that he simply did not give. So for all the reasons I already talked about with respect to the actual innocence claim, this is strict on prejudice and the court should reverse there. So at the end of the day, Antoine Johnson met his burden below. He demonstrated his actual innocence. In the alternative, he established that he received ineffective assistance of counsel. And either way, he deserves a new trial. And it was error for the circuit court to deny him that relief. Thank you, Your Honors. If his trial attorney had canvassed the area that he mentioned, 67th and Black Hawk, around 11 o'clock, not during the day, I guess there's testimony that there are some motions that reference some daytime photos, but nothing at around 11 o'clock. Is it likely, is it your she or her investigators would have found employees of some of the stores around? Maybe people live in the neighborhood who saw what was happening? Absolutely, Your Honor. And it's also likely based on the evidence that she would have found Smurf, Douglas Williams, he testified he lived 20 feet away from that corner, and that he was always there. In addition to... Wait, let me just stop you. Sure. I'm concerned about that line of argument only because he also testified at the hearing, the third state evidentiary hearing, that they were in a game. He wasn't going to talk to police. He didn't want to help anybody. So even if she had gone to the corner at 11, and even if she had found something, we said, oh, yeah, that guy over there is Smurf. And even if she'd gone over to him and talked to him and said, hey, do you want to talk? And even if he had said, yeah, sure, I'll talk. And then she said, do you have anything to tell me that this defendant was at this corner? There's nothing in this record that says he would have been helpful to her. So that to me is less important than not canvassing to find neutral witnesses that aren't part of this gang war. People who live there, people who work there, people who shop there. I take your point, Your Honor. And I think additional support for Your Honor's point is that the woman who died in this case, Patricia Bowers, no indication she's a member of this gang at all. So I think Your Honor is exactly right that the evidence suggests that other people are at the corner at this time, and that they too could have been identified had counsel undertaken this investigation. So do you think that that goes more to your actual innocence claim or your ineffective assistance in counsel claim or both? I think the issue of whether it was implausible that Douglas Williams could have been secured to testify goes to the actual innocence claim. But I think Your Honor's point that there could have been other independent witnesses at the various stores in the area goes to the actual innocence claim. Excuse me, goes to the ineffective assistance claim. Or in the neighborhood, you know, people who live there. I have a question about the actual innocence claim. I'm not finding anything that says the actual innocence, this is hard to explain. I'm not finding anything that says the actual innocence has to be based on a witness who was available at that time. So for example, say we weren't talking about Williams here, we were talking about not Smurf, we were talking about somebody else, some store employee who saw the events, didn't realize Antoine Johnson, the 16-year-old, had been arrested, didn't realize there'd been a murder conviction, didn't realize that this guy's sitting in jail for 28 years. And then all of a sudden, somebody says to him, oh yeah, you know, that kid that they used to call Big Mac, he's in the slammer for this murder. And this unknown witness, employee of the store, says, oh my God, that's not right. I was there the whole time. I saw the whole thing. He was never there. I know what this kid looks like. He buys stuff in this store. So then he comes forward 15 years later and says, I volunteered to tell you what happened, what I saw that night. That would also be a new witness. It wouldn't be Williams, but it would also be a new witness. And that would be a strong actual innocence claim, right? Of course, Your Honor. Okay. So it doesn't matter that Williams didn't come forward until... The state makes this argument that Williams didn't come forward and he wouldn't have been a defendant back in 1998 at the event or 2000 during the trial. That's really irrelevant. What's relevant is whether he's willing to help the defendant in 2015 when he signs his second affidavit. I agree with you. I think it would be a relevant and an important inquiry. Were we disputing whether or not he is new, but for purposes of the actual innocence claim, the state is not disputing that. The state is so trying to make an argument that he, even if in the ineffective assistance of counsel claim, then even if Ms. Lisco had gone to look for him, he wouldn't have been helpful anyways in 1998. Correct, Your Honor. And your response to that is, well, nobody, the defendant wasn't there. So he didn't know to look for Smurf and he didn't know that Smurf was Williams and he couldn't have known that until 2015 or 2013 when they met. But I'm very curious about how this whole thing, the timeline of all of this. And the state wants to argue that because he wasn't, the fact that he wasn't found in 1998 doesn't make any difference, that he wouldn't have been helpful anyhow. And so there's no ineffective assistance of counsel. And I guess I'm saying, well, she didn't look for somebody else because she didn't. And the state also wants to say, oh, well, Williams wasn't going to help in 1998. You can stop me, Mr. Dahl, if I'm wrong, that because he wasn't going to be willing to help in 1998, his testimony in 2015 is affidavit and also at the third stage hearing isn't really credible. I'm having trouble buying that whole argument. Any more questions? I do have some more questions. Okay, then go ahead. Thank you. In the original trial, you've said that you started out by saying there's powerful exculpatory evidence in Mr. Williams' affidavit and that the trial itself was based, was closely balanced because the statement made by a 16-year-old without the advice of counsel, without the help of a concerned adult, parent, grandparent, somebody in his family, or authorized to help him, or looking at what the youth officer did, which we all have to agree was totally nothing. Youth officer didn't even introduce himself. He just sat there like a lump. So I have no idea what the purpose of this youth officer was, although the assistant state's attorney interviewing the defendant said, oh, he's here to make sure your interests are represented. I don't see how that played out. But it seems to me that there's something else that was made a closely balanced, and that was even in his statement, if you're going to accept his statement, which I think is problematic, he says he came out and shot a 38-caliber weapon, and the cops only find nine-caliber bullets, and there was specific testimony that nine-caliber bullets cannot be fired from a 38-caliber gun. So right away, you know that there's some deficiency with his statement, which I'm having trouble believing should have been admitted in the first place. Now, I know that a prior division of our court back in 2003 said, yep, the statement was voluntary. That was long before we had all this good science on juvenile brain development and the exercise of authority on juveniles. And it was also long before we knew the full scale of everything that was happening to young Black men in our Chicago Police Department in the 1990s. So I have a problem with a lot of this case, but if you're going to talk about a closely balanced case, I think that you need to add to your arguments that nine calibers and the 38 calibers just don't match up. That's why it was preposterous. Whether it was the Assistant State's attorney or his own attorney who called it preposterous, that's why it was preposterous. It's impossible for that to have happened that way. So other than that, I'll wait for a few more questions later. Thank you. Thank you, Your Honor. Any further? Nothing. No questions. I have nothing. So Taylor, I guess you can go forward. Thank you, Justices. Assistant State's Attorney Taylor Dahl, D-A-L-L. They appeased the court. Justice Kuczynski, I apologize. I wasn't sure if that question was directed to me at that moment. I didn't want to chime in during my opponent's argument. I apologize. I was not very clear. I just said, if you want to come at me later, fine. Appreciate that. I will address that. However, I'd like to start off with the credibility issue. That is determinative in this case. We are following a third stage post-conviction petition here, or post-conviction hearing. And of course, determinations that were made are reviewed for manifest error, which is a high burden to overcome. And the defendant is unable to do that in this case. The credibility determination, contrary to the defense's argument, was not based solely upon these supposed misapprehensions of error or misunderstanding of what this case was. First of all, I would say that the new theory of the case was, in fact, that he was not there. He does testify, the defendant does testify, in the process of the hearing, that he was actually at a separate corner at the time of the shooting. He was at his gang's preferred hangout spot, which I believe was a few blocks away. He named several individuals for the first time at that hearing that he was with. So it's fair for the trial court to interpret this new theory that not only are these witnesses incredible, I was actually not there. So I don't know who was present, who were. I'm totally unable to say who was there that could give any information about my case. Just, you should go there and see what you can find. So there is grounds to believe that this is a newly positive theory of this case. And beyond that, looking at the testimony of Williams, and of course, ruling on it, the trial court did say that he listened to the witness, observed how he testified, observed what he said, went through the logic of his testimony, how he became known to defendants, their conversations, and how that came to pass. And based on all of that, on the totality of his testimony, and his demeanor, and all of these things, that he found him to be a wholly incredible witness, and didn't believe hardly anything that he said. And that finding, again, error supported by this record, and by the conflicts in the witness's testimony, by the inconsistencies in his testimony, and as I argued in my brief, that it essentially simply doesn't make a whole lot of sense for him to be able to see, and not see, him to properly recall what occurred on that. And there's simply not enough in this record, and not enough information, or none of the deficiencies in this court's ruling to say that it's credibility finding was against the manifest, was manifestly erroneous. This doesn't appear to be fanciful, or completely off base. And that's the standard that the defendant has to overcome at this stage. And they simply cannot do it without that credibility, without that testimony that's outlined, that's arguing, there's no change to the trial, regardless of how it feels about, how they feel now about the trial testimony, which trial testimony evidence, which at this stage, at this stage following a third stage post-conviction hearing, we are not here to retry the defendant, we're not here to reevaluate specifics of that evidence. Yes, we weighed new evidence against what it was, but retrying the credibility, and retrying the white effectiveness, that finder effect the time gave to those, to that testimony, is not the proper inquiry at this stage. Defense does have many issues with the statement, I understand this panel does as well. However, as the justice pointed out, that statement was tested in a pre-trial motion, it was tested at trial by Ms. Lisko, and the jury found that based on the guilty verdict, it had to have considered that testimony, and at least given some weight to it, combined with the eyewitness cases. And then it was reviewed, as the justice pointed out, reviewed on direct appeal. The circuit court's decision, rejecting the motion to suppress evidence, was reviewed and was upheld. So the issue of this statement, the findings regarding that statement, has been previously litigated extensively, and whether that statement should have been admitted, is not an issue presented in this post-conviction petition. It's simply being used as part of this claim that the evidence was closely balanced, and I would argue that it's not the case. The jury was able to rely on that statement, combined with the two eyewitness testimonies, and the testimony of the victim's friend. So given the numerous inconsistencies that I pointed out in my brief, the credibility finding should be upheld. It just doesn't rise to the level of manifest error. Without reliable new evidence, both claims fail. You cannot be, a defendant cannot be prejudiced by not having this wholly unreliable witness testify at trial. And there's no way to get, it cannot be said that having this testimony, this unreliable testimony at trial, would have changed the result. So given that, given that basis alone, the circuit court's finding, its determinations should be upheld. With regard to Pencil's performance, the determinations should be upheld as well. That determination is also the proof of manifest error. And based on this record, I cannot say that it was manifestly erroneous. We have to remember that a defendant is entitled to competent representation, not perfect representation. In a perfect world, every defense attorney would be, might be able to spend, have limitless time and resources to have an individual posted at any particular location to locate potential witnesses or anyone who happened to be walking by and spend the time to do that on multiple days, multiple times a day. That is likely what would have been required to locate this witness who, as the justice pointed out, indicated that he was, had no intention of being co-opted. When it comes to counsel's duty and duty to undertake a reasonable investigation, complying with this extremely vague request with no information to go on, just not, would not, not complying with that, would not, is not unreasonable. Sorry to use a couple negatives there. It was reasonable for counsel to act as how she did, send an investigator to take pictures, to view the scene, to be able to make proper arguments at trial. And those decisions, given that we are supposed to look at them from what counsel knew at the time, she had, she was faced with two eyewitnesses that identified this defendant as well as defendant's statement, which she did try to suppress. That's the motion was overruled. She did try to discredit at the trial. So given, given what she knew at the time, there was no reason for her to believe that a friendly witness would have been present, would have been present at that scene, present at, quote, the center of the world for this opposing gang, for this opposing gang. Defendant testified very clearly that at the time, his faction and this faction were at war. And that, by all accounts, that war was ongoing when, when the trial was taking place, when the investigation was taking place. It's not, it's not reasonable for counsel to believe that sending an investigator at any given time of day to this gang conflict area, where essentially the victims of this shooting are likely to be hanging out, would produce any faithful witnesses. I don't believe it's in the record, but I don't think it's unreasonable to, to assume that the shop owner was interviewed, that these came as the area. There was no issues at trial with the police investigation in that regard or any subsequent stage. So having those reports and having that information, as well as the evidence against her clients, given the situation, it's not, it's not, counsel would not have been absolutely required to go to this scene. Could she have done it? Absolutely. But not doing so is, does not render her representation ineffective. Again, this is competent, competent representation, not perfect. She acted and conducted the trial based on the evidence she had. And there was no indication prior to trial that this individual was, was out there. It wasn't, it wasn't mentioned until the witnesses testified to Williams' presence at trial. And as Kathy Liskos testified, defendant made no mention at that time, made no indication that any, any action should be taken based on that mention. And this makes sense given that we now know he was a good, good friends with the victim and he was present there, a member of that gang and ostensibly in the line of fire himself. So there's certainly a potential there to locate and generate additional victims in this case. So for those reasons, the courts, the circuit court's termination should be upheld. It's not meant to steal. Turning to some, some more technical arguments, the, the actual innocence claim is not even properly before this court. And it, as, as this court stated in its opinion, or I think it was a different panel of this court, stated in its opinion, remanding for, after second stage dismissal, it noted that defendant had not raised an actual innocence claim. And an actual innocence claim was not argued at second stage by the counsel at that time. This, this claim was brought up after evidence closed and based on the record, it's kind of blindsided the state at that time. So this, this particular claim, not only didn't pass second stage, didn't, didn't pass the second stage review. There was no substantial showing that this claim is valid. So it should never have been heard. It was not properly before this court either. For those, for that reason, actual innocence claim should be, dismissal of this claim should be upheld on that reason. There's another technical issue that counsel didn't bring up. And regarding the freestanding claim that we included in our, that state included in this brief. However, that issue is being reviewed by our Supreme Court at this time. People get more annoyed. So expect verification on that issue as well. But at the end of the day, for the reasons stated about the, what this is credibility and the reasonableness of counsel's actions, there, there's no indication that defendant was prejudiced by this, by not having this witness. I mean, he, his testimony, incredible testimony would not change the result of the trial. So I would ask you to uphold the trial courts. Questions? All right, yes. I don't understand why you're saying that, and the court seemed to make a big deal out of it, that the defendant asked his attorney to go send an investigator to some, sort of amorphous place. He didn't. He asked the investigator to go to a specific place. Big O's at 67 Blackstone. It's a brick and mortar place. It's not some empty field. It's not, you know, in the middle of Kansas. It's a specific place in the city of Chicago. Finding on Google maps now, probably couldn't back then. That's a specific place. And he did a perfectly reasonable thing. He said, this is where they hang out. They all hang out there. So people who are there know them, but they know each other. Maybe you'll find somebody who's willing to say what happened. Maybe you'll find somebody who gives a different side of the story. Maybe you'll find, you know, somebody who works in a store, somebody who's shopping, somebody who lives there, some grandma who's on her front porch. Who knows what you'll find if you walk in. But the attorney did not. This isn't just some wild goose chase. This is a specific place at a pretty specific time of day. I don't believe he gave a specific time of day. The testimony was... Well, the event happened at 11. So clearly if people are hanging around on a street corner at 11, shooting dice, smoking weed, selling crack, whatever, they're probably not up and about at nine o'clock the next morning and maybe not even up and about at 11 the next morning. And workers who work in the store at 11 o'clock at night are probably not in that store at 11 o'clock the next couple days later. So I think, you know, there was a specific time of this event and it's reasonable for the defendant to believe that his attorney is going to send the investigator to this specific brick and mortar place at a time at or around when the event happened to look for people who might have seen what was going on. People who are likely to be there at that time. I don't... I personally don't understand why that's so hard for people to understand and accept as a good thing. I'm not saying it's not a good thing or that's something that couldn't be done or given certain situations should be done. It is not necessarily required and not doing so does not make her representation ineffective in this case. Well, okay. So the attorney guessed that she wouldn't be able to find anybody helpful, but she didn't know that because she didn't send an investigator up to test the theory. Is that a correct statement? I'm not entirely sure what Ms. Lisco knew or did not know. You're telling me the attorney just supposed that if she sent somebody out to that big O's at 67th and Blackstone at 11 o'clock at night, she wasn't going to find anybody who was helpful because they're all part of a warring faction of a different gang. They're part of the part that's warring with the mob, which the defendant was in. So they're not going to be helpful. But she guessed that. She supposed that. She thought that. She didn't know it for certain because she didn't send an investigator to prove her guess, to prove her theory, to prove her supposition. She didn't know that there wasn't some grandma sitting across the street or coming out of the church. She didn't know that. And that's what bothers me about that whole argument. I understand the justice point. No, she did not know that, assuming that that was her train of thought. We can't infer that it's reasonable. It's logically reasonable for her to have that belief, for her to make that determination. Why? Only because the gangs are at war. But what about the regular civilians that aren't at war? Why is that reasonable? Well, there is no indication that there would be civilians or anyone. Well, she didn't know. There is no indication that there weren't civilians around. There is no indication that there weren't grandmas coming out of the church. There's no information about anything. I'm not aware of there being a church in that area based on the evidence we have. I know, based on testimony, there was a vacant lot next to this store. There was a church across the street. Up Kitty Corner, I think, is a vacant lot. Across Blackstone is a church. Okay. And you have reminded me about another point. In the defendant's statement, he said he came up behind two shooters. Pumpkin, who was later identified as... Yes, right. The co-defendant. And Quick. But Quick was standing on an entirely different corner. He was... There was one shooter on the corner with the vacant lot. It was Kitty Corner from the store. Diagonally across from the store, he goes. And there was one person standing on the corner with the churches. So he couldn't have come up between the two shooters in an alley because two shooters weren't together. So when the ASA said his statement was preposterous, I actually agree with it. It was preposterous. And he testified at the third stage hearing that he only made the statement. He'd been locked up in a room for eight hours. No one helping him out. No one telling him what his rights were. Nobody told him what his rights as a youth or a juvenile were. And I think by force of will, he says they kept reading his statement. They kept reading his statement. Actually, now in 2024, what we know about the behavior of some Chicago police, not all, but some Chicago police with young Black men in the 1990s and Area 2. I'm not finding that too hard to believe. I understand. And that's certainly something that has come up in recent years. However, as you say, in this case, there's no indication that any of those things occurred. And those issues did go to hearing. The detectives did testify. The state's attorney did testify at hearing. And none of that type of behavior was found. The statement was deemed admissible. That was reviewed and found to be and was upheld. So I understand that there could be a variety of situations that could make a youth statement admissible. There's no evidence or indication that it happened in this case. We can say that because there was hearings. Any other questions? No. Okay. Rebuttal.  Thank you, Your Honor. Obviously, I'm happy to address any points of the state's argument that Your Honors would like to hear from me on. But there's two issues I would like to make sure I respond to. The first is a couple of areas where I think the state dedicated its argument to attacking straw men rather than what our actual position is. The state spent some time at the beginning of the argument with this argument that alibi evidence is insufficient here to warrant a new trial. Antoine could not have recently discovered who he was hanging out with at the time. Maybe so. But that's not the basis for our actual innocence claim. Our actual innocence claim is based on the evidence from Douglas Williams and the other affidavits, not this alibi. So that's a straw man argument. Likewise, a straw man, I think, is the state contending that we can't litigate now whether this preposterous, counterfactual, unrecorded statement was admissible. We're not arguing admissibility here on post-conviction. We're arguing that you weigh the evidence and that this evidence does not get much weight because it is counterfactual, because it's preposterous, because of all these reasons. The other point I wanted to respond to was this notion the state raises that the actual innocence claim is abandoned. I would point the court to its own opinion in the prior appeal, where it said that, specifically said in remanding, that counsel should amend the claims if necessary. And Justice Hyman, in his concurring opinion, put a finer point on it. He says, at this stage, we must accept Williams' affidavit as true. Accordingly, we must accept that Johnson did not shoot a gun on the day of the offense. If that turns out to be true after a hearing, he would be, in a literal sense, innocent of the crime for which he sits in prison. The circuit court followed a very similar analysis here when we raised the actual innocence claim after Williams testified. The circuit court held that it would elevate form over substance, not to consider the claim now. And this court should do the same thing, and it should consider this claim on the merits for a few reasons. One, the evidence that the court heard at the evidentiary hearing was far more robust than what was contained in the very short affidavit that Williams submitted. So the claim was based on new testimony from Williams about what happened and why he was coming forward now. And also the law supports that this claim should be considered on its merits at the evidentiary hearing. And here, the case law is clear that actual innocence claims can be raised at any time. The case law is also clear that we want to avoid piecemeal litigation rather than sending Antwon Johnson back down where he might inevitably file an actual innocence claim. And I would just, it's not directly on point, but I would point the court to the Code of Civil Procedure, section 2-616, which says, at least in civil cases, at any time before final judgment, amendments may be allowed on just and reasonable terms. And specifically says that changing the cause of action or defense or adding new causes of action or defense is acceptable. I think that is highly relevant here in the post-conviction context. I think it would elevate form over substance, not to consider the evidence now. And I think the court should reject the state's abandonment argument. So for all of those reasons and everything in our briefs, we ask the court to reverse. Thank you, your honors. Any questions? No, nothing. All right. Well, thank you very much. You both made a very presentable argument and it leaves us having to go back and think further on this. So thank you for your time. Thank you, your honors.